## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEYINKA BOLADALE OJEDOKUN** | * |
| **39 Boundaries Road** | |
| **Feltham** | * |
| **London TW13 5DR** | |
| **United Kingdom** | * |
| | |
| **Petitioner,** | * |
| | |
| **v.** | *          **Civil No.** |
| | |
| **JUMOKE DORCAS ADEMOYE**[1] | * |
| **4208 Benning Road NE, Apt. 2** | |
| **Washington, DC 20019** | * |
| | |
| **Respondent.** | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### VERIFIED PETITION FOR RETURN OF CHILD TO ENGLAND
### AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

### INTRODUCTION

1.     Petitioner, Adeyinka Boladale Ojedokun ("Father"), by and through his undersigned attorneys, files this Verified Petition for Return of Child to England ("Petition"), against Respondent, Jumoke Dorcas Ademoye ("Mother").

2.     This Petition is filed as a result of Mother's wrongful removal of the parties' son, D.D.O. (the "child" or "son"), born in England in 2021, from England to the United States.  The child's proper custody and habitual residence is England.

3.     The wrongful removal occurred on or about March 30, 2022.

---

[1] Respondent may also be known as Jumoke Ojedokun.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

4.      This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[2] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[3] (hereinafter "ICARA").

5.      The Convention came into force in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom, which includes England, on July 1, 1988.[4]

6.      The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

7.      This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful removal of a child under the age of sixteen from the child's habitual residence of England, and the child is currently located within the jurisdiction of this Court in the District of Columbia.

---

[2] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed March 17, 2023).
[3] 22 U.S.C. 9001 *et seq*. (2015).
[4] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed March 17, 2023).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

## FACTS

8.      Mother and Father are the parents of one son, D.D.O., who is 2 years old.

9.      Since the child's birth (until Mother's removal of the child to the United States), Father, Mother and the child have resided without interruption in England.

10.      From the time of the child's birth in England, the child has always been and continues (until Mother's removal of the child) to be fully involved and integrated in all aspects of daily and cultural life in England, including but not limited to the following ways:

    a.   The child was born at a hospital in Brent, England.

    b.   The child has English citizenship and holds a British passport.

    c.   The child lives in England in the former family home.

    d.   The child shares time with both parents in England.

    e.   The child has his pediatrician, obtains immunizations, and attends medical appointments in England.

    f.   The child receives medical care in England through the United Kingdom's comprehensive national healthcare system.

    g.   The child's Father lives and works in England.

    h.   The child has immediate and extended family in England.

    i.   The child has a settled routine in England.

    j.   The child has friends in England.

    k.   The child engages in activities and play dates in England.

11.      The child is fully involved and immersed in day-to-day family life, cultural life, and education in England. The totality of the child's life is in England.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

12.     Father is a dual citizen of England and Nigeria. Father has lived in England since 2003.

13.     Mother is a citizen of Nigeria. Upon information and belief, she was issued a B1/B2 visitor's visa for the United States which was valid from February 7, 2020 and expired on February 5, 2022.

14.     The parties initially met online and then started long-distance dating in 2016. At the time, Mother was in the United States and residing with her extended family in Washington, DC. Father visited Mother a few times in Washington, DC.

15.     The parties married on January 4, 2019.

16.     Neither of the parties had any children, and both wanted to start a family together in the United Kingdom.

17.     In order to acquire a spousal residence permit for Mother to relocate to the United Kingdom, the parties married in the United States. Father traveled with his family to Washington, DC from England to marry Mother. The parties' marriage occurred in Virginia.

18.     A few days after their marriage, Father returned to England and Mother remained in the United States. The parties then started the process for Mother to acquire a spousal residence permit to relocate to England to join Father and to establish a family there.

19.     In 2019, Mother successfully obtained a spousal residence permit to live and work in England. Mother's United Kingdom residence permit card was issued on June 10, 2019.

20.     Since 2019, Mother has lived in England.

21.     The parties' son, D.D.O., was born in England in 2021. Both parties are identified on the child's birth certificate.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

22.     By virtue of the parties' respective nationalities, the child is a dual citizen of England and Nigeria. The parties jointly arranged for the child to be issued a British passport, which was issued on July 6, 2021. The parties did not arrange for the child to be issued a Nigerian passport, even though the child may be eligible to acquire a Nigerian passport.

23.     Upon information and belief, the child only holds an ESTA visitor visa to travel to the United States and he does not hold immigration status to remain in the United States other than a temporary visit.

24.     The child has never traveled outside of England, prior to Mother's unilateral removal, except for one short trip for Mother to attend her grandmother's funeral. Mother and child traveled to the United States on or about July 15, 2021 and returned home to England on or about August 31, 2021.

25.     While the parties lived together in England, they shared caretaking responsibilities for the child. Mother worked during the day. During Mother's work hours, Father cared for the child. Father worked during the nights. During Father's work hours, Mother cared for the child. From time to time, Father's family babysat the child or the parties hired a babysitter. Both parties were fully involved in the care and upbringing of their son in England.

26.     The parties historically experienced marital difficulties, but remained civil and coparented their son after his birth.

27.     In January 2022, before her United Kingdom residence permit expired on March 17, 2022, Mother renewed and extended her residence permit to remain living in England.

28.     The parties decided to separate in February 2022.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

29.     Father moved from the family home, where Mother and child continued to reside, to his family's residence[5] in England. The parties previously resided in Father's family's home until February 2020 when they moved into their own home together. The parties cooperated to transfer the former family home lease into Mother's sole name.

30.     When the parties separated, Father facilitated amicable negotiations with Mother and requested mediation. The parties agreed on an interim schedule for the child to spend time with both parents, although Father desired to spend more time with the child.

31.     On an interim basis while the parties negotiated a long-term schedule, Father exercised parenting time with the child all day every Monday and Friday in England.

32.     Father proposed additional terms, such as time during the weekend and time for the parties to spend together with the child. At the time, Mother was still nursing the child, the child was approximately one year old, and Father worked overnight shifts as a security guard. Therefore, Father also encouraged Mother to agree to a gradual overnight schedule with Father when the child turned three years old.

33.     Father proposed mediation to develop a written parenting plan. He offered to pay for Mother's share of the initial mediation costs in order to encourage an amicable resolution to coparenting their son.

34.     On February 25, 2022, Mother requested that Father memorialize his proposal in an email attachment to her to see if the parties could agree directly rather than attend mediation. At Mother's request, Father sent Mother his proposed coparenting terms in an email.

35.     Thereafter, the parties scheduled mediation, but Mother kept delaying the mediation. Ultimately, Mother refused to meet with a mediator.

_____

[5] Father's family's home is an approximately 50-minute drive from Mother's home in England.

6

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

36.     The parties operated under the agreed-upon interim parenting schedule, namely, Father spending two days per week with the child, since their separation until Mother's removal of the child from England on or about March 30, 2022.

37.     For the month of March 2022, Father exercised parenting time with the child on Mondays and Fridays as agreed.

38.     On Monday, March 28, 2022, Father exercised his Monday parenting time with the child as agreed.

39.     On March 31, 2022, Father received a message from the landlord to inquire about items being moved from the residence. Father immediately sent Mother a text message to ask why the landlord said items were being moved. Mother responded that "everything is fine" and assured Father that it was another tenant's stuff that was being moved from the building.

40.     On Friday, April 1, 2022, Father arrived at the former family home in England to pick up the child for his Friday parenting time as agreed.

41.     When Father arrived at the home, he knocked on the door several times, but no one answered. Father spoke to the neighbors who said they saw Mother moving items from the home earlier that week.

42.     Father immediately called Mother but her telephone was turned off or she had blocked his number. Later that day, Father wrote an email to Mother asking her to confirm the whereabouts of their child.

43.     Father immediately went to the police station to report that his son was missing. Father was (upon information and belief, mistakenly) told by law enforcement that he had to wait three (3) months to make a missing person's report or to pursue any legal remedies.

44.     Father waited in desperation for three months.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

45.     During this time, Father tried to contact Mother by telephone, email and WhatsApp. Mother refused to answer any of Father's communications.

46.     After the expiration of three months, Father returned to the police station. In August 2022, law enforcement opened an investigation and confirmed that Mother removed the child from England on a British Airways flight to the United States on or about March 30, 2022.

47.     Father was surprised to learn that Mother absconded with the child outside of the country because the child's British passport (and only jointly issued passport) is held for safekeeping by the parties' pastor in England.

48.     The parties separated in February 2022 because Father learned that Mother, upon information and belief, married Father solely to acquire British citizenship. When Father confronted Mother with the information he learned, he said he intended to report the information to the Home Office, which handles immigration matters in the United Kingdom. Shortly thereafter, Mother absconded with the child from England.

49.     Since the child's birth, the parties and the child have exclusively resided without interruption in England. The child has not resided in the United States or anywhere else outside of England. The child only traveled to the United States once for a short visit during the summer of 2021 and then returned home with Mother to England.

50.     The parties never had any discussions whatsoever about Mother and the child leaving England on or about March 30, 2022.

51.     At the time of Mother's removal, Mother was working as a teacher at a school in England. Mother also left without providing notice to her employer of her resignation.

52.     Mother unilaterally removed the child from England without Father's knowledge or consent. Father never agreed for Mother to abscond with the child from England.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

53.     Mother then terminated all contact between Father and the child. Father has had no direct contact with the child for nearly one year, despite requests from Father.

54.     Father is concerned for the child's well-being with Mother, who has refused to disclose the child's whereabouts or communicate with Father about the child.

55.     Father has attempted to reach Mother directly in an effort to check on the child's wellbeing and to resolve the matter relating to their son's return home to England. Mother refuses to return Father's communications. Father therefore has no alternative but to initiate these proceedings.

56.     After law enforcement confirmed that Mother removed the child to the United States, Father began researching the legal remedies available to him to seek the return of the child to England.

57.     Father had no previous experience with any litigation or with any law enforcement matter, and therefore did not know where to start or from whom he should seek assistance.

58.     In August 2022, at the recommendation of law enforcement, Father initiated a child custody proceeding in the Family Court at West London, England. The Family Court advised Father to initiate a proceeding for return of the child in the High Court in London.  The Family Court proceeding is stayed while Father seeks the return of the child to England.

59.     After conducting further research on the remedies available to him, Father learned about the Hague Convention and the available remedies under the Convention. Father also learned for the first time that he could submit a Hague Convention Application to the Central Authority for England & Wales (ICACU).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

60.     In November 2022, Father therefore timely submitted his Hague Convention Application for Return to the Central Authority for England & Wales (International Child Abduction and Contact Unit ("ICACU")) in accordance with the Convention, seeking the return of the child to England.

61.     In or around February 2023, approximately three months after Father submitted his application, Father's Hague Convention Application for Return was transmitted by the Central Authority for England to the United States Department of State Office of Children's Issues (the United States Central Authority).

62.     The United States Central Authority confirmed to undersigned counsel that Mother's address is located in the District of Columbia.

63.     Mother refuses to return the child home to England.

64.     From the totality of the circumstances perspective, England is the child's habitual residence.

65.     The child has lived in England since his birth and has never resided in the United States or anywhere else outside England.

66.     The parties never had a shared intent for the child to live anywhere other than England. The parties only shared, settled intent with respect to the child's habitual residence has been that the child will reside in England.

67.     Father did not and does not consent to the child living anywhere other than England, or living in the United States temporarily, permanently or indefinitely, or being removed from England and retained in the United States.

68.     Father has not acquiesced in Mother's removal of the child from England to the United States.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

69.     At the time of Mother's removal, Father had (and continues to have) rights of custody to the child in England, by operation of English law, as fully set forth below.

70.     Mother's removal of the child from England to the United States breaches Father's rights of custody under English law.

71.     With the assistance of the United States Central Authority, Father has now been able to find and retain reduced-fee representation in seeking the return of the child to England through this Petition for Return in this Court.

## COUNT I – WRONGFUL REMOVAL

72.     Father restates and re-alleges the averments contained in Paragraphs 1 through 71 as if fully set forth herein.

73.     The Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

74.     The child in this case is under the age of 16.

75.     The habitual residence of the child is England.

76.     The child has resided in England for all his life by agreement of the parties. At the time Mother removed the child, the child has only lived in England.

77.     The parties never agreed for the child to live outside of England, and never agreed for the child to live in the United States.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

78.     The child is fully involved in all aspects of daily family life and cultural life in England. Based on the facts of the family's history, the parties' shared intent for the child to live in England, the child's perspective of home as England, the child's routine and settled life in England, and the totality of the circumstances, the child's habitual residence is England.

79.     Notice is given in this pleading that Father is relying upon foreign law. Fed.R.Civ.P. 44.1.

80.     The law of England governs the application of law as it relates to Father's rights of custody.

81.     At the time Mother removed the child from England to the United States, Father had—and continues to have—rights of custody to the child under operation of English law pursuant to the Children Act 1989.

82.     Part 1, Section 2 of the Children Act 1989 provides: "Where a child's father and mother were married to [or civil partners of,] each other at the time of his birth, they shall each have parental responsibility for the child."

83.     Part 1, Section 3 defines parental responsibility as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property."

84.     Parental responsibility involves the "care of the child" and is recognized as a right of custody under Article 5*a* of the Hague Convention.[6]

85.     Father is the biological father of the child, is named on the child's birth certificate, and the parties were married at the time of the child's birth.

---

[6] *See, e.g., Hanley v. Roy*, 485 F.3d 641, 647–48 (11th Cir. 2007).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

86.     Father therefore has rights of custody, namely parental responsibility for the child, pursuant to operation of English law.

87.     Father has these rights of custody by operation of law. He had these rights of custody (and continues to have these rights of custody) at the time Mother removed the child from England to the United States on or about March 30, 2022.

88.     At the time of Mother's removal of the child from England, Father was actually exercising—or would have been actually exercising but for Mother's removal—his custody rights, within the meaning of Articles 3 and 5*a* of the Convention, by caring for the child, fully participating in the child's life, and undertaking all parenting responsibilities since the child was born.

89.     Father has requested the return of the child to England by submitting a Hague Application for Return with the Central Authority for England and Wales.

90.     Mother's removal of the child from England to the United States is therefore wrongful under the Hague Convention because Mother has (1) removed the child to the United States; (2) from the child's habitual residence of England; (3) in breach of Father's rights of custody to the child under English law; and which (4) Father was exercising at the time of the removal (or would have been exercising but for Mother's wrongful removal).

91.     Father has timely taken all legal steps available to him to seek the return of the child to England in accordance with the Hague Convention.

92.     The child is currently physically located within the District of Columbia.

## COUNT II – ARTICLE 18 RETURN

93.     Father restates and re-alleges the averments contained in Paragraphs 1 through 92 as if fully set forth herein.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

94.     Father invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.[7]

95.     In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, Father requests that this Court exercise its equitable discretion to return the child to England under Article 18 even if Mother establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.[8]

96.     The child here has an interest in returning to England, his country of habitual residence.

97.     The child has close ties with England; in particular, he has close ties to: (a) Father; (b) his friends; (c) his extended family; (d) his activities; (e) his medical care; (f) his education; and (g) his English culture.

98.     The child has a strong need for regular daily contact with Father, who was exercising rights of custody at the time the child was removed from England to the United States.

99.     Mother is now severely restricting meaningful contact, both in-person and electronic, between the child and Father. Mother has cut off all contact for Father.

100.     Father has an interest in exercising his rights of custody in England, which he was doing at the time Mother removed the child to the United States.

101.     The governments of England and the United States both have an interest in discouraging inequitable conduct and deterring international child abductions.

---

[7] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *Lozano v. Alvarez*, 134 S.Ct. 1224, 1237 (2014) (Alito, J., concurring); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[8] *See Lozano*, 134 S.Ct. at 1237 (Alito, J., concurring) (listing factors that weigh in favor of returning a child to the country of habitual residence even when a narrow discretionary exception to return is established).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

## PROVISIONAL AND EMERGENCY REMEDIES[9]

102.    Simultaneously with the filing of this Petition, Father files a Request to Expedite Proceedings Pursuant to Hague Convention Law (with Incorporated Memorandum of Law).

103.    Father requests that this Court issue a Show Cause Order forthwith[10] due to the expedited nature of this child abduction case and pursuant to the Hague Convention, the mandate of the United States Supreme Court, the implementing federal statute and relevant authority.

104.    Father requests that the Show Cause Order: i) direct the United States Marshals Service to serve this Court's Show Cause Order and all other pleadings and papers filed in this case on Mother; and ii) direct the United States Marshals Service to collect at the time of service all travel documents for Mother and the child, including, but not limited to, the child's passport(s) (British, Nigerian and/or otherwise), Mother's Nigerian passport (valid and expired originals), the child's birth certificate, and all other travel documents (*e.g.*, visas) to be held for safekeeping by the Clerk of this Court in escrow during the pendency of the proceedings.

105.    Father further requests that this Court's Show Cause Order include provisions: i) setting an expedited initial hearing for Mother to appear with the child on the first available date on the Court's calendar in order to schedule the expedited evidentiary hearing and all related deadlines and for the Court to confirm the exact whereabouts of the child in Washington, DC as

---

[9] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition."  ICARA § 9004.

[10] Such an approach is consistent with the approach of other district courts faced with equivalent concerns regarding the flight of a respondent following service of a petition for return under the Convention.  See *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1343 (S.D. Fla. 2002).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

required by ICARA §9003(b); and ii) prohibiting the removal of the child from the jurisdiction of this Court during the pendency of this proceeding.[11]

106.     Mother has demonstrated that she is a substantial flight risk, having already cut off all contact between Father and child and having unilaterally removed the child from his home in England without notification to Father. Mother refuses to disclose the child's whereabouts or confirm his wellbeing.

107.     Father is unaware of how Mother obtained a passport for the child because the child's British passport is held for safekeeping by the parties' pastor in England. Father is very concerned that, upon information and belief, Mother surreptitiously obtained a Nigerian passport for the child and will abscond to Nigeria if the Court does not order provisional remedies.

108.     Upon information and belief, Mother has access to resources and family members in Nigeria (Mother's parents live in Nigeria), and therefore has the ability to remove the child outside of the District of Columbia to a different jurisdiction or country outside of this Court's jurisdiction. Mother's flight risk is aggravated by the fact that she is a citizen of Nigeria, which is not a Hague Convention treaty partner with the United States or England.

109.     Upon information and belief, the child does not hold any long-term immigration status in the United States.

110.     Unless this Court takes immediate action to issue a Show Cause Order, irreparable harm will occur to the well-being of the child in that he will be deprived of his Father, his home, and his life in England.

---

[11] A Petition may also be treated as an application for a Writ of Habeas Corpus itself. *Zajaczkowski v. Zajaczkowska*, 932 F. Supp. 128, 132 (D.Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243").

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

111.     Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."  ICARA § 9004.  In this case, the referenced law is the District of Columbia.

112.     In the District of Columbia, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified at D.C. Code Ann. § 16-4601.01 *et seq*.

113.     District of Columbia law addresses the appearance of the parties and the child in such cases in UCCJEA § 16.4602.10. That section authorizes this Court to order the appearance of the child and custodian or custodians *together*. *Id.* This Court therefore has the authority to issue a show cause order, ordering the appearance of Mother and the child in that the provisions of 22 U.S.C. § 9004 can be met.

114.     Father requests that his appearance be excused for the initial Show Cause hearing. Father's counsel will appear on his behalf at the Show Cause Hearing, and will have full authority to schedule all further hearings and deadlines in this case.

115.     In accordance with the Hague Convention Articles 2 and 11, ICARA, 28 U.S.C. § 1657, the requirement of the Supreme Court of the United States that courts use the most expeditious procedures available, and the good and meritorious cause to expedite consideration of Father's Petition, Father respectfully requests that this Court enter an initial Show Cause Order forthwith in the form submitted to this Court, setting an expedited date for a scheduling hearing, on the first date available on the Court's calendar, and thereafter allowing for full resolution of this matter within six weeks of the date of filing this Petition.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

## UCCJEA DECLARATION

116.   The details regarding the minor child that are required to be provided under the UCCJEA are as follows:

a.   Upon information and belief, the child has been physically located at the following address, with Mother, from on or about March 30, 2022 to present as a result of Mother's wrongful removal of the child: 4208 Benning Road NE, Apt. 2, Washington, DC 20019.

b.   From mid-February 2022 until on or about March 30, 2022 (as a result of Mother's removal), the child resided with Mother at: 6 Eton Court, Eton Avenue, Wembley, HA0 3BB, in England.

c.   From the child's birth in 2021 until mid-February 2022, the child resided with Mother and Father at: 6 Eton Court, Eton Avenue, Wembley, HA0 3BB, in England.

d.   Father does not have information of any custody proceeding concerning the child pending in any other court of this or any other State, except as set forth in this Petition.

e.   Father does not know of any person, or institution, not a party to the proceedings, which has physical custody of the child or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

## NOTICE OF HEARING

117.    Pursuant to ICARA § 9003(c), Mother will be given notice of any hearings in accordance with Section 16-4602.05 of the District of Columbia's UCCJEA.[12]

### ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

118.    Father has incurred significant expenses as a result of the wrongful removal of the child by Mother. Father will submit, in accordance with the Federal Rules of Civil Procedure and this Court's local rules, a copy of all attorneys' fees, expenditures and costs, according to proof, incurred as a result of Mother's wrongful removal.

119.    Father respectfully requests that this Court award all reasonable and necessary expenses and attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner, Adeyinka Boladale Ojedokun, respectfully requests the following relief:

A. That this Court issue an Order directing the prompt return of the child to his habitual residence of England in accordance with Petitioner's rights of custody under English law and Articles 3, 5*a* and 18 of the Convention; and

B. That this Court issue an initial Show Cause Order forthwith in the form submitted by undersigned counsel, directing the United States Marshals Service to i) serve this Court's initial Show Cause Order and all other pleadings and papers filed in this case on

---

[12] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

Respondent; and ii) collect at the time of service all the child's passports and other travel documents and Respondent's passports and travel documents to held in escrow by the Clerk of this Court during the pendency of the proceedings; and

C.  That the Court's Show Cause Order include provisions prohibiting the removal of the child from the jurisdiction of this Court during the pendency of this proceeding; and

D.  That the Court's initial Show Cause Order set an expedited scheduling hearing for Respondent to appear in person with the child, and for Petitioner to appear through counsel, on the first available date on the Court's calendar to schedule the final evidentiary hearing and all related deadlines and to confirm that the child is physically located within this Court's jurisdiction; and

E.  That this Court excuse the appearance of Petitioner at the initial Show Cause Hearing as long as Petitioner's counsel appears on his behalf and has full authority from Petitioner to schedule an expedited evidentiary hearing and all related deadlines; and

F.  That this Court order daily electronic video and telephone access for Petitioner with the child during the pendency of these proceedings; and

G.  That if Respondent removes the child or causes the child to be removed from the jurisdiction of this Court, that this Court issue an Order directing that the name of the child be entered into the national police computer system (N.C.I.C.) missing persons section, and that an arrest warrant be issued for Respondent; and

H.  That this Court issue an Order directing Respondent to pay Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

I.  That this Court grant any such further relief as justice and Petitioner's cause may require.

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86

## VERIFICATION

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING VERIFIED PETITION FOR RETURN IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

EXECUTED ON ___03 / 17 / 2023___ .

*Adeyinka.o*
_____
Adeyinka Boladale Ojedokun
*Petitioner*


Respectfully submitted this 21st day of March, 2023.


/s/ Leah Ramirez_____
Leah Ramirez, DC Bar No. 1031995
MARKHAM LAW FIRM
2154 Wisconsin Avenue NW
Washington, DC 20007
(240) 858-8716
(301) 368-2774 (e-fax)
LRamirez@markhamlegal.com

*Attorneys for Petitioner*

21

Doc ID: 7694ec5673a1583a3f1e5e2a108578f507fbac86